1  Cristina Perez Hesano (#027023)
   **PEREZ LAW GROUP, PLLC**
2  7508 N. 59th Avenue
3  Glendale, Arizona  85301
   Phone:  (602) 730-7100
4  Fax:  (602) 794-6956
   cperez@perezlawgroup.com
5
6  Terence R. Coates (*pro hac vice* forthcoming)
   Dylan J. Gould *(pro hac vice forthcoming)*
7  **MARKOVITS, STOCK & DEMARCO, LLC**
   119 E. Court Street, Suite 530
8  Cincinnati, OH 45202
   Phone: (513) 651-3700
9  Fax: (513) 665-0219
   *SCampbell@msdlegal.com*
10
11
12 Joseph M.  Lyon (*pro hac vice* forthcoming)
   **The Lyon Firm, LLC**
13 2754 Erie Ave.
   Cincinnati, Ohio  45208
14 Phone (513) 381-2333
   jlyon@thelyonfirm.com
15
16 *Attorneys for Plaintiff and the Class*

17            **UNITED STATES DISTRICT COURT**

18               **DISTRICT OF ARIZONA**

19

20 | Oscar Irazaba, on behalf of himself and | Case No. |
21 | all others similarly situated, | |
22 | Plaintiff, | **CLASS ACTION COMPLAINT** |
23 | v. | **Demand For Jury Trial** |
24 | Banner Health, | |
25 | Defendant. | |
26
27

-1-

Plaintiff Oscar Irazaba brings this action in his individual capacity and on behalf of all others similarly situated against Defendant Banner Health ("Banner" or "Defendant"), and alleges, upon personal knowledge as to his own actions, his counsels' investigation, and upon information and belief as to all other matters, as follows:

1.      Plaintiff brings this case to address Defendant's illegal and widespread practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook").

2.      Defendant owns and controls the website https://www. https://www.bannerhealth.com/, along with the Banner Health Patient Account portal, which can be accessed from the website (collectively, the "Website"). Through the Website, patients can access information about various conditions and treatments, Banner's numerous locations and the practitioners at each location, and other general information about Banner Health and the services it offers to its patients. The Website also contains an "Emergency ChatBot" and a "Symptom Checker" for patients to input their real time symptoms and experiences on the Website and receive feedback based on the medical information they supply.[1] Critically, patients can also access their Patient Account through the Website, which contains other aspects of patients' PII and PHI.

3.      Defendant installed and implemented the Facebook Tracking Pixel (the "Pixel" or "Facebook Pixel") on its Website, which secretly enables the unauthorized transmission

_____

[1] https://www.bannerhealth.com/patients

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

P

and disclosure of Plaintiff and Class Members' PII and PHI as it is communicated to Defendant.

4.     Based on Defendant's use of the Pixel, and evidence demonstrating that the information transmitted via the Pixel was indeed linked to Plaintiff's personal Facebook account, Plaintiff asserts Defendant also installed and implemented the Facebook Conversions Application Programming Interface ("Conversions API") on its Website.

5.     By implementing Conversions API, Defendant secretly enabled additional unauthorized transmissions and disclosures of Plaintiff and Class Members' PII and PHI.[2]

6.     More specifically, Defendant's Website directs Plaintiff's and Class Members' communications to automatically and surreptitiously be sent to Facebook's servers. This occurs on every webpage on which Defendant has installed the Tracking Pixel and Conversions API.[3]

7.     Thus, operating as designed and as implemented by Defendant, the Pixel allows the Private Information that Plaintiff and Class Members submit to Defendant to be unlawfully disclosed to Facebook alongside the individual's unique and persistent Facebook ID ("FID").

---

[2] "Conversions API works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited: January 25, 2023).
[3] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api (last visited: January 27, 2023).

8.      Similarly, Conversions API stores Plaintiff's and Class Members' Private Information from visiting Defendant's Website and transmits it to Facebook.

***Tracking Pixel***

9.      A pixel is a piece of code that "tracks the people and [the] type of actions they take"[4] as they interact with a website, including how long a person spends on a particular web page, which buttons the person clicks, which pages they view, the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), and more.

10.     The User's web browser executes the Pixel via instructions within the Defendant's webpage to communicate directly to Facebook certain parameters defined by the Defendant.

11.     The pixel can share the user's Facebook User ID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser.[5] Cookies are only transmitted to the owner site from the user's web browser and cannot be accessed by any other site.

12.     The Facebook Pixel is programmable, meaning that the Defendant controls which of its webpages contain the Pixel and which events are tracked and transmitted to Facebook.

---

[4] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited Nov. 14, 2022).

[5] "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited: January 27, 2023).

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

13.    Pixels are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting and future marketing. Upon information and belief, Defendant utilized the Pixel data for marketing purposes in an effort to bolster its profits. Facebook also uses Plaintiff's and Class Members' Private Information to create targeted advertisements based on the medical conditions, symptoms, and treatments, and other information disclosed to Defendant.

***Conversions API***

14.    The Facebook Conversions API allows businesses and companies to send web events from their servers to Facebook.[6]

15.    Conversions API is designed to create a direct and reliable connection between marketing data (such as website events and offline conversions) from Defendant's server to Facebook.[7] In doing so, Defendant stores Plaintiff's and Class Members' Private Information on Defendant's own server and then transmits it to Facebook.

16.    Conversions API is an alternative method of tracking versus the Pixel because no privacy protections on the user's end can defeat it. This is because it is implemented Server-Side, rather than executed by Users' web browsers.

---

[6] https://revealbot.com/blog/facebook-conversions-api/ (last visited: January 24, 2023).
[7] https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited: January 25, 2023).

17.     Because Conversions API is Server-Side, it cannot access the Facebook Cookie to retrieve the Facebook User ID.[8] Therefore, other round-about methods of linking the user to their Facebook account must be employed.[9]

18.     Facebook has an entire page within their developers' website about how to de-duplicate data received when both a Pixel is executed as well as Conversions API.[10]

19.     Conversions API tracks the user's website interaction, including Private Information, and then transmits this data to Facebook. Indeed, Facebook markets Conversions API as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."

***Purpose of this Lawsuit***

20.     Accordingly, this case arises from Defendant's intentional, reckless, and/or negligent disclosure of Plaintiff's and Class Members' confidential and private medical information to Facebook.

---

[8] "Our systems are designed to not accept customer information that is unhashed Contact Information, unless noted below. Contact Information is information that personally identifies individuals, such as names, email addresses, and phone numbers, that we use for matching purposes only." https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters/ (last visited: January 27, 2023).

[9] "Sending additional customer information parameters may help increase Event Match Quality. Only matched events can be used for ads attribution and ad delivery optimization, and the higher the matching quality, the better." https://developers.facebook.com/docs/marketing-api/conversions-api/best-practices/#req-rec-params (last visited: January 27, 2023).

[10] https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events (last visited: January 27, 2023).

-6-

21.    The information that Defendant's Tracking Pixel and Conversions API sent to Facebook included Private Information that Plaintiff and Class Members submitted to Defendant's Website, including for example, the type of medical treatment sought, the particular health condition, and the fact that the individual attempted to or did book a medical appointment. Such Private Information would allow a third party (e.g., Facebook) to know that a specific patient was seeking confidential medical care. This type of disclosure could also allow a third party to reasonably infer that a specific patient was being treated for a specific type of medical condition such as cancer, pregnancy, dementia, or HIV.

22.    Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers who geotarget Plaintiff's and Class Members' Facebook pages based on communications obtained via the Facebook Pixel and Conversions API.

23.    For instance, Plaintiff submitted medical information to Defendant's Website and used the Website to schedule appointments with healthcare professionals, communicate with his doctors and communicate Private Information, complete patient web forms, and review medical healthcare and billing records.

24.    Shortly thereafter, this information was communicated from Defendant's Website to Facebook.

25.    Defendant regularly encourages Plaintiff and Class Members to use its digital tools, including its Website, to receive healthcare services. Plaintiff and Class Members provided their Private Information through Defendant's Website with the reasonable understanding that Defendant would secure and maintain any PII and PHI as confidential.

26.     At all times Plaintiff and Class Members visited and utilized Defendant's Website, they had a reasonable expectation of privacy in the Private Information collected through Defendant's Website, including that it would remain secure and protected and only utilized for medical purposes.

27.     Plaintiff and Class Members provided Private Information to Defendant in order to receive medical services rendered and with the reasonable expectation that Defendant would protect their Private Information. Plaintiff and Class Members relied on Defendant to secure and protect the Private Information and not disclose it to unauthorized third-parties without their knowledge or consent.

28.     Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchange with Defendant.

29.     Defendant owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class Members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized disclosure.

30.     Defendant, however, failed in its obligations and promises by utilizing the Facebook Pixel and Conversions API, described below, on its Website knowing that such technology would transmit and share Plaintiff's and Class Members' Private Information with Facebook.

31.     While Defendant willfully and intentionally incorporated the Tracking Pixel and Conversions API into its Website, Defendant never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications via the Website with Facebook. As a result, Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to Facebook as they communicated their healthcare information and other Private Information via the Website.

32.     Defendant breached its obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web based technology to ensure the hospital Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) failing to obtain the consent of Plaintiff and Class Members to disclose their Private Information to Facebook or others; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Facebook Pixels; (v) failing to warn Plaintiff and Class Members; and (vi) otherwise failing to design, and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

33.     Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Pixel, (iii) loss of benefit of the bargain, (iv) diminution of value of the Private Information, (v) statutory damages, and (vi) the continued and ongoing risk to their Private Information.

34.     Plaintiff seek to remedy these harms and bring causes of action for (i) Negligence; (ii) Invasion of Privacy; (iii) Breach of Confidence; (iv) Breach of Implied Contract; (v) Unjust

-9-

Enrichment; (vi) Violations of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1)—unauthorized interception, use, and disclosure; (vii) Violations of ECPA, 18 U.S.C. § 2511(3)(a)—unauthorized interception, use, and disclosure; (viii) Violations of Title II of the ECPA, 18 U.S.C. § 2702, *et seq.*—Stored Communications Act; (ix) Violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq*; and (x) Violations of the Arizona Consumer Fraud Act ("ACFA"), A.R.S. § 44-1521, *et seq*.

**PARTIES**

***Plaintiff Oscar Irazaba***

35.    Plaintiff is a natural person and citizen of Peoria, Arizona, where he intends to remain. On numerous occasions, Plaintiff accessed Defendant's Website. Plaintiff used the Website to find and obtain medical treatment. Pursuant to the systematic process described herein, Plaintiff's Private Information was disclosed to Facebook, and this data included his PII, PHI, and related confidential information. Defendant intercepted and/or assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

36.    Plaintiff is a current patient of Banner Health. Plaintiff has been one of Defendant's patients for roughly 13 years and has used the Website numerous times since he first engaged Defendant for healthcare services. He has used his account to access the Website and use various digital services provided by Defendant since at least 2019.

37.     Plaintiff Irazaba used Defendant's Website to conduct the following activities: request and schedule appointments, communicate with healthcare professionals, complete medical forms, and request and review healthcare and billing records.

38.     As Defendant's patient, Plaintiff Irazaba reasonably expected that his online communications with Defendant were solely between himself and Defendant and that such communications would not be transmitted or intercepted by a third party. Plaintiff also relied on Defendant's Privacy Policies in reasonably expecting Defendant would safeguard his Private Information. But for his status as Defendant's patient and Defendant's Privacy Policies, Plaintiff would not have disclosed his Private Information to Defendant.

39.     During his time as a patient, Plaintiff Irazaba never consented to the use of his Private Information by third parties or to Defendant enabling third parties, including Facebook or Google, to access or interpret such information.

40.     Notwithstanding, through the Tracking Pixel and Conversions API, Defendant transmitted Plaintiff Irazaba's Private Information to third parties, such as Facebook and Google.

41.     Plaintiff Irazaba has been a regular Facebook user for more than 10 years.

42.     Shortly after using Defendant's Website Plaintiff has seen numerous targeted advertisements on Facebook related to his medical conditions and treatments sought through Banner Health.

***Defendant Banner Health***

43.     Defendant Banner Health originally incorporated in the state of Arizona in 1938, where it remains an active domestic nonprofit corporation, headquartered at 2901 N. Central

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

P

Ave., Suite 160, Phoenix, AZ 85012.

44.     Defendant is one of the largest nonprofit hospital systems in the country, operating 30 acute-care hospitals and a number of other service centers and clinics throughout the states of Arizona, California, Colorado, Nebraska, Nevada, and Wyoming. As of 2021, Banner Health is the largest private employer in Arizona with more than 50,000 employees across its various locations.

45.     Although Defendant operates under the name "Banner Health" it consists of a network of services, hospitals, clinics, and programs known by various names including, but not limited to: Banner – University Medical Center Tucson, Banner – university medical Center Phoenix, Banner – University Medical Center South, Banner Alzheimer's Institute, Banner Concussion Center, Banner Heart Hospital, Banner MD Anderson Cancer Center, Banner Children's, Banner Health network, Banner Medical Group, and Banner – University Medicine.

46.     According to its Website, Defendant was serving at least one million members across its numerous locations and services as of 2021.

47.     Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 "HIPAA").

**JURISDICTION & VENUE**

48.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the

proposed class, and at least one member of the class, is a citizen of a state different from Defendant.

49.    This Court has federal question jurisdiction under 29 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (28 U.S.C. § 2511, *et seq.*, and 28 U.S.C. § 2702) and the CFAA (18 U.S.C. § 1030, *et seq*).

50.    This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

51.    Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

### COMMON FACTUAL ALLEGATIONS
***Background: Underlying Technology Employed by Defendant for the Purpose of Disclosing Plaintiff and Class Members' Private Information to Facebook.***

52.    Defendant purposely installed the Pixel and Conversions API tools on many of its webpages within its Website and programmed those webpages to surreptitiously share its patients' private and protected communications with Facebook, including communications that contain Plaintiff's and Class Members' PHI and PII.

53.    Defendant uses the Website to connect Plaintiff and Class Members to Defendant's digital healthcare platforms with the goal of increasing profitability.

54.    In order to understand Defendant's unlawful data-sharing practices, it is important first to understand basic web design and tracking tools.

***Facebook's Business Tools and the Pixel***

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

55.     Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[11]

56.     In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

57.     Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

58.     The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL") and metadata, button clicks, etc.[12] Advertisers, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[13]

---

[11] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 14, 2022)

[12] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142. (last visited Nov. 14, 2022); see FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Nov. 14, 2022).

[13] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; see also FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/. (last visited Nov. 14, 2022)

-14-

59.     One such Business Tool is the Pixel which "tracks the people and type of actions they take."[14] When a user accesses a webpage that is hosting the Pixel, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers—traveling from the user's browser to Facebook's server.

60.     Notably, this transmission only occurs on webpages that contain the Pixel. Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to Facebook via the Pixel but for Defendant's decisions to install the Pixel on its Website.

61.     Similarly, Plaintiff's and Class Member's Private Information would not have been disclosed to Facebook via Conversions API but for Defendant's decision to install and implement that tool.

62.     By installing and implementing both tools, Defendant caused Plaintiff's and Class Member's communications to be intercepted and transmitted to Facebook via the Pixel, and it caused a second improper disclosure of that information via Conversions API.

63.     As explained below, these unlawful transmissions are initiated by Defendant's source code concurrent with communications made via certain webpages.

***Defendant's method of transmitting Plaintiff's and Class Members' Private Information via the Tracking Pixel and/or Conversions API i.e., the interplay between HTTP Requests and Responses, Source Code, and the Pixel***

64.     Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet.  Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web

---

[14] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

65.    Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

66.    Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. POST Requests can send a large amount of data outside of the URL. (For instance, uploading a PDF for filing a motion to a court)

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses

may consist of a web page, another kind of file, text information, or error codes, among other data.[15]

67.    A patient's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as a physician's "Book an Appointment" page). The HTTP Response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendant's Website.

68.    Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

69.    Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Defendant's Pixel is source code that does just that. The Pixel acts much like a traditional wiretap. When patients visit Defendant's website via an HTTP Request to Banner's server, Defendant's server sends an HTTP Response including the Markup that displays the Webpage visible to the user and Source Code including Defendant's Pixel. Thus, Defendant is in essence handing patients a tapped phone, and once the Webpage is loaded into the patient's browser, the software-based wiretap is quietly waiting for private communications on the Webpage to trigger the tap, which intercepts those communications intended only for

---

[15] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

Defendant and transmits those communications to third-parties, including Facebook and Google.

70.    Third parties, like Facebook, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third-party can uniquely identify the patient associated with the Personal Information intercepted.

71.    With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Personal Information, like Facebook, implement workarounds that savvy users cannot evade. Facebook's workaround, for example, is called Conversions API. Conversions API is an effective workaround because it does the transmission from their own servers and does not rely on the User's web browsers. Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]." Thus, the communications between patients and Defendant, which are necessary to use Defendant's Website, are actually received by Defendant and stored on its server before Conversions API collects and sends the Private Information contained in those communications directly from Defendant to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

72.    While there is no way to confirm with certainty that a Web host like Defendant has implemented workarounds like Conversions API without access to the host server, companies like Facebook instruct Defendant to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup"

-18-

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

allows Defendant "to share website events [with Facebook] that the pixel may lose."[16] Thus, it is reasonable to infer that Facebook's customers who implement the Facebook Pixel in accordance with Facebook's documentation will also implement the Conversions API workaround.

73.    The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner (*i.e.,* to bolster profits).

74.    Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

75.    In this case, Defendant employed the Tracking Pixel and Conversions API to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Facebook.

76.    For example, when a patient visits www.bannerhealth.com and selects the "Get Care Now" button, the patient's browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage. As depicted below, the user only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses.

---

[16]    *See* https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last visited Jan. 23, 2023).





*Figure 1. The image above is a screenshot taken from the user's web browser upon visiting https://www.bannerhealth.com (last accessed June 7, 2023).*

77.    The Facebook Tracking Pixel is embedded in Defendant's Source Code contained in its HTTP Response. The Pixel, programmed to automatically track and transmit the patient's communications with Defendant's Website to Facebook, executes instructions that effectively open a hidden spying window into the patient's browser through which Facebook can intercept the visitor's data, actions, and communications with Defendant.[17]

78.    Defendant's Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and

---

[17] When used in the context of a screen or visual display, a "pixel" is the smallest unit in such a digital display. An image or video on a device's screen can be made up of millions of individual pixels. The Facebook Pixel is a tiny image file that is so small as to be invisible to website users. It is purposefully designed and camouflaged in this manner so that website users remain unaware of it.

to send those communications to Facebook. These transmissions occur contemporaneously, invisibly, and without the patient's knowledge.

79.     Thus, without its patients' consent, Defendant has effectively used its source code to commandeer and "bug" or "tap" it patients' computing devices, allowing Facebook and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

80.     Consequently, when Plaintiff and Class Members visit Defendant's website and communicate their Private Information, including, but not limited to, medical treatment sought, booking an appointment, selected physician's name and specialty, specific button/menu selections, content (such as searches for symptoms or treatment options) typed into free text boxes, and demographic information, it is simultaneously intercepted and transmitted to Facebook.

***Defendant Disclosed Plaintiff's and Class Members' Private Information to Facebook Using the Pixel and/or Conversions API Tracking Practices***

81.     Defendant utilizes Facebook's Business Tools and intentionally installed the Pixel and Conversions API ("First Party cookies") on its Website and servers to secretly track patients by recording their activity and experiences in violation of its common law, contractual, statutory, and regulatory duties and obligations.[18]

82.     Defendant's Pixel has its own unique identifier (represented as id=3176911905318614), which can be used to identify which of Defendant's webpages contain the Pixel.

_____

[18] *Id.*

-21-

83.    The Pixel allows Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs.[19] However, Defendant's Website do not rely on the Pixel in order to function.

84.    While seeking and using Defendant's services as a medical provider, Plaintiff and Class Members communicated their Private Information to Defendant via its Website.

85.    Plaintiff and Class Members were not aware that their Private Information would be shared with Facebook as it was communicated to Defendant because, amongst other things, Defendant did not disclose this fact.

86.    Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to Facebook, nor did they intend for Facebook to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

87.    Defendant's Pixel and First Party cookies sent non-public Private Information to Facebook, including but not limited to Plaintiff's and Class Members': (1) status as medical patients; (2) health conditions; (3) desired medical treatment or therapies; (4) desired locations or facilities where treatment was sought; (5) phrases and search queries (such as searches for symptoms, treatment options, or types of providers); and (6) searched and selected physicians and their specialties conducted via the general search bar.

88.    Importantly, the Private Information Defendant's Pixel sent to Facebook was sent alongside the Plaintiff's and Class Members' Facebook ID (c_user cookie or "FID"), thereby

---

[19] *Id.*

allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts and therefore their identity.[20]

89.    A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including location, pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

90.    Defendant deprived Plaintiff and Class Members of their privacy rights when it: (1) implemented technology (i.e., the Facebook Pixel and First Party cookies) that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications and Private Information; (2) disclosed patients' protected information to Facebook—an unauthorized third-party; and (3) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

### Defendant's Pixel Disseminates Patient Information via Its Website

91.    An example illustrates the point. If a patient uses the Website to find their physician, Defendant's Website directs them to communicate Private Information, including

---

[20] Defendant's Website track and transmit data via first-party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

their physician's name and specialty. Unbeknownst to the patient, each and every communication is sent to Facebook via Defendant's Pixel, including the medical condition the patient types into the search bar and the filters they select.



92.     In the example above, the user searched for a physician specialized in treating "anxiety" who is currently offering local services.

93.     Next, the user narrows their search results by typing "Atlanta, GA" into the "City & State or Zip" search bar and set the location filters to physicians who are "within 10 miles" of the city.

94.     Unbeknownst to ordinary patients, this particular webpage—which is undoubtedly used to communicate Private Information for the purpose of seeking medical treatment—contains Defendant's Pixel. The image below shows the "behind the scenes"

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

portion of the website that is invisible to ordinary users. Importantly, each entry in the column represents just one instance in which Defendant's Pixel sent this particular user's information to Facebook.



95.    Thus, without alerting the user, Defendant's Pixel sends each and every communication the user made via the webpage to Facebook, and the images below confirm that the communications Defendant sends to Facebook contain the user's Private Information.



96.    The first line of highlighted text, "id:317691905318614" refers to Defendant's Pixel ID and confirms that Defendant has downloaded the Pixel into its Source Code for this particular webpage.

97.    On the same line of text, "ev= PageView," identifies and categorizes which actions the user took on the webpage ("ev=" is an abbreviation for event, and "PageView" is the type of event). Thus, this identifies the user as having viewed the particular webpage after applying their search criteria and filters.

98.    The additional lines of highlighted text show Defendant has disclosed to Facebook that the user: (1) is a patient seeking medical care from Defendant via www.bannerhealth.com.

99.     Finally, the highlighted text ("GET") demonstrates that Defendant's Pixel sent the user's communications, and the Private Information contained therein, alongside the user's Facebook ID (c_user ID), thereby allowing the user's communications and actions on the website to be linked to their specific Facebook profile.

100.     The image demonstrates that the user's Facebook ID (highlighted as "c_user=" in the image below) was sent alongside the other data. [21]

101.     To make matters worse, Defendant's Pixel even tracks and records the exact text and phrases that a user types into the general search bar located on Defendant's homepage. In the example below, the user typed "I have cancer" into the search bar.



102.     Resultantly, that exact phrase is sent to Facebook, thereby allowing the user's medical condition to be linked to their individual Facebook account for future retargeting and exploitation. This is simply unacceptable, and there is no legitimate reason for sending this information to Facebook.

---

[21] The user's Facebook ID is represented as the c_user ID highlight in the image below, and Plaintiff has redacted the corresponding string of numbers to preserve the user's anonymity.

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

id: 534707753606264

ev: PageView

dl: https://www.bannerhealth.com/search?query=I%20have%20cancer

rl: https://www.bannerhealth.com/

if: false

ts: 1685550505691

sw: 1920

sh: 1080

v: 2.9.104

r: stable

ec: 0

o: 28

fbp: fb.1.1685542516980.2007203529

it: 1685550505567

coo: false

exp: a1

rqm: GET

▼ General

Request URL:          https://www.facebook.com/tr/?id=534707753606264&ev=PageView&dl=https%3A%2F%2Fwww.bannerhealth.com%2Fsearch%3Fquery%3DI%2520have%2520cancer&rl=https%3A%2F%2Fwww.bannerhealth.com%2F&if=false&ts=1685550505691&sw=1920&sh=1080&v=2.9.104&r=stable&ec=0&o=28&fbp=fb.1.168554251
                      6980.2007203529&it=1685550505567&coo=false&exp=a1&rqm=GET
Request Method:       GET
Status Code:          ● 200
Remote Address:       157.240.28.35:443
Referrer Policy:      strict-origin-when-cross-origin

▼ Response Headers

Access-Control-Allow-   true
Credentials:
Access-Control-Allow-Origin:
Alt-Svc:              h3=":443"; ma=86400
Content-Length:       0
Content-Type:         text/plain
Cross-Origin-Resource-Policy:  cross-origin
Date:                 Wed, 31 May 2023 16:28:25 GMT
Priority:             u=3,i
Server:               proxygen-bolt
Strict-Transport-Security:  max-age=31536000; includeSubDomains

▼ Request Headers

:Authority:           www.facebook.com
:Method:              GET
:Path:                /tr/?
                      id=534707753606264&ev=PageView&dl=https%3A%2F%2Fwww.bannerhealth.com%2Fsearch%3Fquery%3DI%2520have%2520cancer&rl=https%3A%2F%2Fwww.
                      bannerhealth.com%2F&if=false&ts=1685550505691&sw=1920&sh=1080&v=2.9.104&r=stable&ec=0&o=28&fbp=fb.1.1685542516980.2007203529&it=1685550
                      505567&coo=false&exp=a1&rqm=GET
:Scheme:              https
Accept:               image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
Accept-Encoding:      gzip, deflate, br
Accept-Language:      en-US,en;q=0.9
Cookie:               sb=FrBbZFkSQQ_l7QnAhjlstBx3; datr=FrBbZFyLq1lV3VVT0WWTyS9m; c_user [REDACTED] xs=34%3AF_r9qTBmAx5nqA%3A2%3A1685549916%3A-
                      1%3A2661; fr=0ZbYUKzLnbUt61mBj.AWWrld-db91HMOAzF6se07C9HxQ.Bkd19E.P0.AAA.0.0.Bkd3Na.AWVgcFjs26A

103.    At present, the full breadth of Defendant's tracking and data sharing practices is

unclear, but other evidence suggests Defendant is using additional tracking pixels and tools to

transmit its patients' Private Information to additional third parties. For example, the image below indicates that Defendant is also sending its patients' protected health information to Google via Google Tag Manager.

104.     The image below contains the user's search phrase ("I have cancer"), and Defendant does not appear to have enabled the anonymize feature provided by Google Analytics because the text "aip:" does not appear in the image.



105.     Accordingly, Google receives patients' communications alongside the patients' IP address, which is also impermissible under HIPAA.

106.    In addition, upon information and belief and as described above, Defendant has also installed First party cookies on its servers to record and store its patients' Website interactions and Private Information before transmitting that information directly to Facebook via Defendant's computer server.

107.    In each of the examples above, the user's website activity and the contents of the user's communications are sent to Facebook alongside their personally identifiable information. Several different methods allow marketers and third parties to identify individual website users, but the examples above demonstrate what happens when the website user is logged into Facebook on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's  c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile.

108.    Facebook receives at least six cookies when Defendant's website transmits information via the Pixel:

**Request Cookies**    ☐ show filtered out request cookies

| Name | Value | Domain |
|---|---|---|
| sb | uV1... | .facebook.com |
| datr | uV1... | .facebook.com |
| c_user | 100... | .facebook.com |
| usida | eyJ... | .facebook.com |
| xs | 16... | .facebook.com |
| fr | 0hxl... | .facebook.com |

109.    When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies:[22]



110.    156.    The fr cookie contains an encrypted Facebook ID and browser identifier.[23] Facebook, at a minimum, uses the fr cookie to identify users, and this particular cookie can stay on a user's website browser for up to 90 days after the user has logged out of Facebook.[24]

111.    The cookies listed in the two images above are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. Although Facebook created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout its website.

112.    Defendant also revealed its website visitors' identities via first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and a user:[25]

---

[22] The screenshot below serves as example and demonstrates the types of data transmitted during an HTTP single communication session. Not pictured here and in the preceding image is the _fbp cookie, which is transmitted as a first-party cookie.

[23] Data Protection Commissioner, Facebook Ireland Ltd: Report of Re-Audit (Sept. 21, 2012), p. 33, http://www.europe-v-facebook.org/ODPC_Review.pdf (last visited May 11, 2023).

[24] Cookies & other storage technologies, FACEBOOK.COM, https://www.facebook.com/policy/cookies/ (last visited May 11, 2023).

[25] *Id.*

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

| _fbp | fb.1.1686147863271.2049175303 | .bannerhealth.com |
|------|-------------------------------|-------------------|

113.    Importantly, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies because, unlike the fr cookies and c_user cookie, the _fbp cookie functions as a first-party cookie—i.e. a cookie that was created and placed on the website by Defendant.[26]

114.    The Facebook Tracking Pixel uses both first- and third-party cookies.

115.    In summation, Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and, because the Pixel is automatically programmed to transmit data via both first-party and third-party cookies, patients' information and identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

116.    Defendant does not disclose that the Pixel, First Party cookies, Google Tag Manager, or any other tracking tools embedded in the Website's source code tracks, records, and transmits Plaintiff's and Class Members' Private Information to Facebook and Google. Moreover, Defendant never received consent or written authorization to disclose Plaintiff and Class Members' private communications to Facebook or Google.

***Defendant's Conduct Violates its Own Privacy Policies and Promises***

---

[26] The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

117.    Defendant's website contains both a page dedicated to the "Banner Health Privacy Statement"[27] as well as a link to Defendant's "Notice of Privacy Practices."[28] These notices convey conflicting messages to Banner's patients and website users.

118.    For instance, the Notice of Privacy Practices assures Defendant's patients from the start that:

> Banner is committed to protecting the confidentiality of information about you and is required by law to do so. This notice describes how we may use information about you within Banner Health and how we may disclose it to others outside Banner. We will notify you if there is a breach of your unsecured protected health information. This notice also describes the rights you have concerning your own health information.[29]

119.    Defendant's Privacy Statement, however, makes the express statement the "Pixel Tag or Clear GIKFs, also known as Wb beacons or Web Bugs, are transparent graphical images placed on a website. Currently, Banner Health does not use them on its site." This claim was last updated in 2019, but as demonstrated herein, remains false.[30]

120.    Furthermore, Defendant's Privacy Statement purports to enumerate "How we use and share user information" and expressly states that it "does not sell User Information to third parties." None of the enumerated uses in Defendant's Privacy Statement cover its conduct of surreptitiously collecting PII and PHI and disclosing it to third parties for marketing purposes.[31]

---

[27] https://www.bannerhealth.com/about/legal-notices/privacy (last visited June 7, 2023)
[28] https://www.bannerhealth.com/patients/patient-resources/privacy (accessible through link "Notice of Privacy Practices (HIPAA) Fact Sheer (PDF)" last visited June 7, 2023)
[29] *Id*.
[30] https://www.bannerhealth.com/about/legal-notices/privacy (last accessed June 6, 2023)
[31] *Id*.

121.    Defendant violated its own privacy policy by unlawfully intercepting and disclosing Plaintiff's and Class Members' Private Information to Facebook and third parties without adequately disclosing that it shares Private Information with third parties and without acquiring the specific patients' consent or authorization to share the Private Information.

***Defendant Violated HIPAA Standards***

122.    Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[32]

123.    Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

124.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data... If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[33]

125.    In its guidance for Marketing, the Department further instructs:

---

[32] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).
[33] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited June 7, 2023)

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or his protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[34]

126.     In addition, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies ("tracking technologies").[35]

127.     The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

128.     In other words, HHS has expressly stated that Defendant has violated HIPAA Rules by implementing the Facebook Pixel.

### Defendant Violated Industry Standards

129.     A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

---

[34]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited June 7, 2023)

[35] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 7, 2023)

130.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

131.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

132.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

133.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c ) release patient information only in keeping ethics guidelines for confidentiality.

***Plaintiff's and Class Members' Expectation of Privacy***

134.    Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

135.    Indeed, at all times when Plaintiff and Class Members provided their PII and PHI to Defendant, they all had a reasonable expectation that the information would remain

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

### *IP Addresses are Personally Identifiable Information*

136.    On information and belief, through the use of the Facebook Pixel on the Defendant's Website, Defendant also disclosed and otherwise assisted Facebook with intercepting Plaintiff's and Class Members' Computer IP addresses.

137.    An IP address is a number that identifies the address of a device connected to the Internet.

138.    IP addresses are used to identify and route communications on the Internet.

139.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

140.    Facebook tracks every IP address ever associated with a Facebook user.

141.    Google also tracks IP addresses associated with Internet users.

142.    Facebook, Google, and other third-party marketing companies track IP addresses for use of tracking and targeting individual homes and their occupants with advertising by using IP addresses.

143.    Under HIPAA, an IP address is considered personally identifiable information:

a.    HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses.  *See* 45 C.F.R. § 164.514 (2).

b.    HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an

-37-

individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

144.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

***Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures***

145.    The sole purpose of the use of the Facebook Pixel on Defendant's Website was marketing and profits.

146.    In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on Facebook.

147.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

148.    By utilizing the Pixel, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

## TOLLING

149.    Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that his PII and PHI was intercepted and unlawfully disclosed to Facebook because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

-38-

150.    Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

151.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

**All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent as a result of using Defendant's Website (the "National Class").**

152.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

153.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

154.    <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1). The Nationwide Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are over one million individuals whose Private Information may have been improperly disclosed to Facebook, and the Class is identifiable within Defendant's records.

155.    <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

    a.    Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

-39-

b.  Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c.  Whether Defendant violated its privacy policy by disclosing the Private Information of Plaintiff and Class Members to Facebook and/or additional third parties.

d.  Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

e.  Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

f.  Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

g.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

h.  Whether Defendant violated the consumer protection statutes invoked herein;

i.  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j.  Whether Defendant knowingly made false representations as to its data security and/or privacy policy practices;

k.  Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy policy practices; and

l.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Private Information.

156.  <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their PII and PHI compromised as a result of Defendant's incorporation of the Facebook Pixel, due to Defendant's misfeasance.

157.  <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

158.  <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions

would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

159.    <u>Policies Generally Applicable to the Class</u>. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

160.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

161.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

162.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

163.    Unless a Class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

164.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

165.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

-43-

a.  Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

b.  Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information with respect to Defendant's privacy policy;

c.  Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d.  Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e.  Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

f.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

g.  Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

166.  Plaintiff reserves the right to amend or modify the Class definition as this case progresses.

## COUNT I
## NEGLIGENCE

**(On Behalf of Plaintiff and the National Class)**

167.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

168.    Defendant required patients and users, including Plaintiff and Class Members, to submit non-public PII and PHI in the ordinary course of interacting with Defendant's website and seeking to obtain medical care and treatment.

169.    By collecting this information from Plaintiff and Class Members in the course of its business, Defendant owed a duty of care to use reasonable means to secure and safeguard said information. This duty of care included a responsibility not only to maintain secure servers and data security protocols, but also to keep information collected confidential. This duty was heightened by the sensitive nature of the PII and PHI collected from Plaintiff and Class Members.

170.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

171.    Defendant owed a duty of reasonable care to Plaintiff and Class Members to maintain the confidentiality of Plaintiff's and Class Members' sensitive PII and PHI.

172.    Defendant's duty of care to exercise reasonable care in protecting the confidentiality of Private Information that it is entrusted with arose from ordinary principles of foreseeability, industry standards, and the special relationship that existed between Defendant and its patients. Defendant was in a superior position to ensure that its systems

were sufficient and that its employees and agents were adequately trained to protect against the foreseeable risk of harm to Class Members from the unauthorized disclosure of their Private Information.

173. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

174. Defendant also had a duty to safeguard Private Information under the Arizona Consumer Fraud Act ("ACFA"), A.R.S. §§ 44-1521, *et seq.*, which prohibits "deceptive or unfair" acts or practices. A.R.S. §§ 44-1522(A). In construing the ACFA, the Court should "use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code §§ 45, 52 and 55(a)(1)." A.R.S. § 44-1522(C).

175. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Engaging the use of the Facebook Pixel and Conversions API when it knew or should have known that this would track and record the interactions of Plaintiff and Class Members with Defendant's Website;

b. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

c. Failing to adequately program the Pixel and Conversions API to protect the anonymity of Plaintiff and Class Members;

d.  Failing to prevent foreseeable access to Class Members' PHI and PII;

e.  Negligently and/or recklessly failing to understand or detect the disclosure of Plaintiff's and Class Members' PHI and PII to third parties; and

176.   It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PHI and PII would result in injury to Class Members. Furthermore, the tracking, recording, and transmission of patients' personal information was foreseeable, as this is what the Pixel is designed to do, and it is widely understood in Defendant's field that third parties often seek to collect data when providing business services, and Defendant's field contains a large quantity of sensitive, confidential information inaccessible from other industries.

177.   Plaintiff and Class Members are entitled to nominal, punitive, compensatory and/or consequential damages suffered as a result of the Data Breach.

178.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) immediately stop the use of the Facebook Pixel and Conversions API and (ii) submit to future annual audits of its cyber-security, data collection, and third party business services systems.

## COUNT II
## INVASION OF PRIVACY
### (On Behalf of Plaintiff and the National Class)

179.   Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

180.    The Private Information of Plaintiff and Class Members consists of private and confidential facts and information that was never intended to be shared beyond private communications.

181.    Plaintiff and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

182.    Defendant owed a duty to Plaintiff and Class Members to keep their Private Information confidential.

183.    Defendant's unauthorized disclosure of Plaintiff's and Class Members' Private Information to Facebook, a third-party social media and marketing giant, is highly offensive to a reasonable person.

184.    Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Private Information constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

185.    Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendant facilitated Facebook's simultaneous eavesdropping and wiretapping of confidential communications.

186.    Defendant failed to protect Plaintiff's and Class Members' Private Information and acted knowingly when it installed the Pixel onto its Website because the purpose of the Pixel is to track and disseminate individual's communications with the Website for the purpose of marketing and advertising.

187.    Because Defendant intentionally and willfully incorporated the Facebook Pixel into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

188.    As a proximate result of Defendant's acts and omissions, the private and sensitive Private Information of Plaintiff and the Class Members was disclosed to a third party without authorization, causing Plaintiff and the Class to suffer damages.

189.    Plaintiff, on behalf of himself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, punitive damages, plus prejudgment interest, and costs.

190.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of Facebook and the wrongful disclosure of the information cannot be undone.

191.    Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook who on information and belief continues to possess and utilize that information.

192.    Plaintiff, on behalf of himself and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of

Plaintiff's and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

### COUNT III
**Breach of Confidence**
**(On behalf of Plaintiff and the National Class)**

193.     Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

194.     Medical providers have a duty to their patients to keep non-public medical information completely confidential.

195.     Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website, which were further buttressed by Defendant's express promises in its privacy policy.

196.     Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Pixel and Conversions API to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

197.     These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

198.     The third-party recipients included, but were not limited to, Facebook.

199.     The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

200.    As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendant's breach in that:

    a.  Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

    a.  Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    b.  Defendant eroded the essential confidential nature of the provider-patient relationship;

    c.  General damages for invasion of their rights in an amount to be determined by a jury;

    d.  Nominal damages for each independent violation;

    e.  Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

    f.  Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

    g.  Defendant's actions diminished the value of Plaintiff's and Class Members' Personal Information; and

    h.  Defendant's actions violated the property rights Plaintiff and Class members have in their Personal Information.

-51-

1

2

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

## COUNT IV
### Breach of Implied Contract
### (On behalf of Plaintiff and the National Class)

201.    Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

202.    When Plaintiff and Class Members provided their user data to Defendant in exchange for services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

203.    Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

204.    Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

205.    Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to a third party, *i.e.*, Facebook.

206.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially for these services, had they known their Private Information would be disclosed.

207.    Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

## COUNT V
### Unjust Enrichment
### (On behalf of Plaintiff and the National Class)

208.    Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein, with the exception that this claim is brought in the alternative to breach of contract.

209.    Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

210.    Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

211.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

212.    The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Minnesota and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

213.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT VI
### Violations of Electronic Communications Privacy Act ("ECPA")
### 18 U.S.C. § 2511(1) *et seq.*
### Unauthorized Interception, Use, and Disclosure
### (On Behalf of Plaintiff and the National Class)

214.    Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

215.    The ECPA protects both sending and receipt of communications.

216.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

217.    The transmissions of Plaintiff's Private Information to Defendant via Defendant' Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

218.    The transmissions of Plaintiff's Private Information to the Webpage and Third Party medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

219.    **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a  wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

220.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

221.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents ... include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

222.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device ... which can be used to intercept a[n] ... electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.  Plaintiff's and Class Members' browsers;

    b.  Plaintiff's and Class Members' computing devices;

    c.  Defendant's web-servers; and

    d.  The Pixel Code deployed by Defendant to effectuate the sending and acquisition of patient communications

223.    By utilizing and embedding the Pixel on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

224.    Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixel, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to Facebook.

225.    Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

226.    By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

227.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

228.    **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

229.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel and Conversions API to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

230.    Defendant was not acting under color of law to intercept Plaintiff and the Class Member's wire or electronic communication.

231.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Pixel tracking code.

232.    Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

233.    In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions, including as described above the following: (1) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person; and (2) violation of Mo. Rev. Stat. § 407.010 *et seq.*

<u>**COUNT VII**</u>
**Violations of the Electronic Communications Privacy Act**
**Unauthorized Divulgence by Electronic Communications Service**
**18 U.S.C. § 2511(3)(a)**
**(On Behalf of Plaintiff and the National Class)**

234.    Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

235.    The ECPA Wiretap statute provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

236.    **Electronic Communication Service**. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

237.    Defendant's Website is an electronic communication services that give users the ability to send or receive electronic communications to Defendant and, upon information and belief, medical professionals who contract with, but are not employed by Defendant. In the absence of Defendant's Website, internet users could not send or receive communications regarding Plaintiff's and Class Members' Private Information.

238.    Defendant's Website is a conduit of communication between Plaintiff and Class Members and their respective medical providers, including third parties who are not employed by Defendant, but contract with Defendant to provide medical treatment and services for its patients.

239.    Defendant's Website is also a conduit between Plaintiff and Class Members and the Webpage.

240.    **Intentional Divulgence**. Defendant intentionally designed the Pixel and Conversions API tracking and was or should have been aware that it could divulge Plaintiff's and Class Members' Private Information.

241.    **While in Transmission**. Upon information and belief, Defendant's divulgence of the contents of Plaintiff's and Class Members' communications was contemporaneous with their exchange with Defendant's Website and/or MyChart Portal, to which they directed their communications.

242.    Defendant divulged the contents of Plaintiff's and Class Members' electronic communications without authorization. Defendant divulged the contents of Plaintiff's and Class Members' communications to Facebook without Plaintiff's and Class Members' consent and/or authorization.

243.    **Exceptions do not apply**. In addition to the exception for communications directly to an ECS or an agent of an ECS, the Wiretap Act states that "[a] person or entity providing electronic communication service to the public may divulge the contents of any such communication":

    a.    "as otherwise authorized in section 2511(2)(a) or 2517 of this title;"

    b.    "with the lawful consent of the originator or any addressee or intended recipient of such communication;"

    c.    "to a person employed or authorized, or whose facilities are used, to forward such communication to its destination;" or

    d.    "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency."

U.S.C. § 2511(3)(b).

244.    Section 2511(2)(a)(i) provides:

It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is

a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

245.     Defendant's divulgence of the contents of Plaintiff's and Class Members' communications on Defendant's Website and/or MyChart Portal to Facebook was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (1) a necessary incident to the rendition of Defendant's service; nor (2) necessary to the protection of the rights or property of Defendant.

246.     Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

247.     Defendant's divulgence of the contents of user communications on Defendant's browser through the Pixel and Conversions API code was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above: (a) Plaintiff and Class Members did not authorize Defendant to divulge the contents of their communications; and (b) Defendant did not procure the "lawful consent" from the Websites or apps with which Plaintiff and Class Members were exchanging information.

248.     Moreover, Defendant divulged the contents of Plaintiff and Class Members' communications through the Facebook Pixel to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

249.    The contents of Plaintiff's and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

250.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages; preliminary and other equitable or declaratory relief as may be appropriate; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT VIII**
**Violations of Title II of the Electronic Communications Privacy Act**
**Stored Communications**
**18 U.S.C. § 2702, *et seq*.**
**(On Behalf of Plaintiff and the National Class)**

251.    Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

252.    The ECPA further provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

253.    **Electronic Communication Service.**  ECPA defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).

254.    Defendant's Website is a conduit of communication between Plaintiff and Class Members and their respective medical providers, including third parties who are not

employed by Defendant, but contract with Defendant to provide medical treatment and services for its patients.

255.    Defendant's Website is also a conduit between Plaintiff and Class Members and the Webpage.

256.    Defendant intentionally procures and embeds various Plaintiff's PII and PHI through the Pixel Code and Conversions API used on Defendant's Website, which qualifies as an Electronic Communication Service.

257.    **Electronic Storage**. ECPA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

258.    Defendant stores the content of Plaintiff's and Class Members' communications with Defendant's Website and files associated with it via the Tracking Pixel or Conversions API. As explained above, via Conversions API, Defendant stores Plaintiff's and Class Members' Private Information on its servers and then transmit that Private Information to Facebook.

259.    By way of another example, Defendant stores data pertaining to scheduling appointments, IP addresses, and communications regarding medical treatment.

260.    When Plaintiff or Class Member communicates with the Website, the content of that communication is immediately placed into storage.

261.    Defendant knowingly divulges the contents of Plaintiff's and Class Members' communications through its Website' source code.

262.    **Exceptions Do Not Apply**. Section 2702(b) of the Stored Communication Act provides that an electronic communication service provider "may divulge the contents of a communication—"

     a.  "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient."

     b.  "as otherwise authorized in Section 2517, 2511(2)(a), or 2703 of this title;"

     c.  "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote Computing service;"

     d.  "to a person employed or authorized or whose facilities are used to forward such communication to its destination;"

     e.  "as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service;"

     f.  "to the National Center for Missing and Exploited Children, in connection with a reported submission thereto under section 2258A."

     g.  "to law enforcement agency, if the contents (i) were inadvertently obtained by the service provider; and (ii) appear to pertain to the commission of a crime;"

     h.  "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any

person requires disclosure without delay of communications relating to the

emergency"; or

i.    "to a foreign government pursuant to an order from a foreign government

that is subject to an executive agreement that the Attorney General has

determined and certified to Congress satisfies Section 2523."

263.    Defendant did not divulge the contents of Plaintiff's and Class Members'

communications to "addressees," "intended recipients," or "agents" of any such addressees or

intended recipients of Plaintiff and Class Members.

264.    Section 2517 and 2703 of the ECPA relate to investigations by government

officials and have no relevance here.

265.    Section 2511(2)(a)(i) provides:

It shall not be unlawful under this chapter for an operator of a switchboard, or
an officer, employee, or agent of a provider of wire or electronic
communication service, whose facilities are used in the transmission of a wire
or electronic communication, to intercept, disclose, or use that communication
in the normal course of his employment while engaged in any activity which is
a necessary incident to the rendition of his service or to the protection of the
rights or property of the provider of that service, except that a provider of wire
communication service to the public shall not utilize service observing or
random monitoring except for mechanical or service quality control checks.

266.    Defendant's divulgence of the contents of Plaintiff's and Class Members'

communications on Defendant's Website to Facebook was not authorized by 18 U.S.C. §

2511(2)(a)(i) in that it was neither: (1) a necessary incident to the rendition of the Defendant's

services; nor (2) necessary to the protection of the rights or property of Defendant.

267.    Section 2517 of the ECPA relates to investigations by government officials and

has no relevance here.

PEREZ LAW GROUP, PLLC
7508 North 59th Avenue
Glendale, Arizona 85301

268.    Defendant's divulgence of the contents of user communications on Defendant's Website and/or MyChart Portal was not done "with the lawful consent of the originator or any addresses or intend recipient of such communication[s]." As alleged above: (a) Plaintiff and Class Members did not authorize Defendant to divulge the contents of their communications; and (b) Defendant did not procure the "lawful consent" from the Websites or apps with which Plaintiff and Class Members were exchanging information.

269.    Moreover, Defendant divulged the contents of Plaintiff's and Class Members' communications through the Facebook Pixel to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

270.    The contents of Plaintiff's and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

271.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages; preliminary and other equitable or declaratory relief as may be appropriate; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT IX**
**Violations of the Computer Fraud and Abuse Act (CFAA)**
**18 U.S.C. § 1030,** *et seq.*
**(On Behalf of Plaintiff and the National Class)**

272.    Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

273.    The Plaintiff's and the Class's computers and/or mobile devices are, and at all relevant times have been, used for interstate communication and commerce, and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2)(B).

274.    Defendant exceeded, and continues to exceed, authorized access to the Plaintiff's and the Class's protected computers and obtained information thereby, in violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C).

275.    For example, Defendant exceeded its unauthorized access because Defendant accessed Plaintiff's and Class Members' Private Information under false pretenses, *i.e.*, Defendant did not disclose it was transmitting Private Information to Facebook.

276.    Moreover, Defendant exceeded its unauthorized access because Defendant violated its *own* Privacy Policies in disclosing Plaintiff's and Class Members' Private Information to Facebook.

277.    Defendant's conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), *inter alia*, because of the secret transmission of Plaintiff's and the Class's private and personally identifiable data and content – including the Website visitor's electronic communications with the Website, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real-time ("Website Communications") which were never intended for public consumption.

278.    Defendant's conduct also constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV) due to the Private Information of Plaintiff and the Class

being made available to Defendant, Facebook, and/or other third parties without adequate legal privacy protections.

279.    Accordingly, Plaintiff and the Class are entitled to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

## COUNT X
### Violations of the Arizona Consumer Fraud Act
### A.R.S. § 44-1521, et seq.
### (On Behalf of Plaintiff and the National Class)

280.    Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

281.    The ACFA states:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

A.R.S. § 44-1522(A).

282.    Plaintiff, Class members, and Defendant are "persons" under the ACFA. A.R.S. § 44-1521(6).

283.    The services that Defendant provides are "merchandise" under the ACFA. A.R.S. § 44-1521(5).

284.    Defendant made uniform representations to Plaintiff and Class Members that their PII/PHI will remain private, as evidenced by, *inter alia*, its privacy policy. Defendants

-67-

also committed deceptive omissions in violation of the ACFA by failing to inform Plaintiff and Class Members that Defendant would disclose their PII/PHI for commercial purposes without consent. Documents that should have contained such disclosures, but did not, include the privacy policy cited in this Complaint.

285.    Defendants separately engaged in unfair acts and practices in violation of the ACFA by failing to implement and maintain reasonable security measures to protect and secure Plaintiffs' and Class Members' PII/PHI in a manner that complied with applicable laws, regulations, and industry standards, or alternatively, by intentionally disclosing Plaintiff's and Class Members' PII/PHI for commercial purposes without consent. Such acts and practices violate established public policy, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

286.    Plaintiff and Class Members have had their privacy invaded and lost property in the form of their PII/PHI. The harm to Plaintiff and Class Members sufficiently outweighs any justifications or motives for Defendants' practice of disclosing Private Information for commercial purposes without consent.

287.    Plaintiffs and all other Class members were damaged by Defendants' violation of the ACFA because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) their PII/PHI was improperly disclosed to unauthorized individuals; (iii) the confidentiality of their PII/PHI has been breached; (iv) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; and (v) they overpaid for the services that were received without adequate data security.

288.   Plaintiff and Class Members are entitled to, *inter alia*, nominal, compensatory, and/or statutory damages as a result of Defendant's unlawful conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.   For an Order certifying the Nationwide Class and appointing Plaintiff and their Counsel to represent such Class;

B.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C.   For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members:

D.   For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.   For prejudgment interest on all amounts awarded; and

G.   Such other and further relief as this Court may deem just and proper.

-69-

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

DATE: June 8, 2023                         Respectfully Submitted,

/s/ Christina Perez Hesano
Cristina Perez Hesano (#027023)
**PEREZ LAW GROUP, PLLC**
7508 N. 59th Avenue
Glendale, AZ 85301
Telephone: 602.730.7100
Fax: 623.235.6173
*cperez@perezlawgroup.com*

Terence R. Coates*
Dylan J. Gould*
**MARKOVITS, STOCK & DEMARCO, LLC**
119 E. Court St., Ste. 530
Cincinnati, Ohio 45202
Phone: (513) 651-3700
Fax: (513) 665-0219
*tcoates@msdlegal.com*
*dgould@msdlegal.com*

Joseph M. Lyon*
**The Lyon Law Firm**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333
Fax: (513) 766-9011
*jlyon@thelyonfirm.com*

***Counsel for Plaintiff and the Putative Class***

* *pro hac vice* forthcoming